CRAVER and others *v.* WEYHRICH and others.

*(Circuit Court, S. D. Illinois. 1887.)*

1. PATENTS FOR INVENTIONS—ABANDONMENT.

A delay of 10 years in applying for a patent, when the inventor had sufficient means, coupled with the sale of machines with the improvement by the patentee, during that time, *held* to be an abandonment by him of his invention to the public.

2. SAME—IMPROVEMENT IN HARVESTERS.

Letters patent No. 135,256, dated September 22, 1874, for an improvement in harvester or header, *held* void; the invention having been abandoned to the public before application for the patent was made.

*John R. Bennett,* for complainants.
*M. D. Leggett,* for defendants.

GRESHAM, J. On September 22, 1874, Walter F. Randolph obtained letters- patent No. 135,256, containing a single claim, for an improvement in harvesters. On July 6, 1880, he obtained a reissue of this patent, containing two additional claims; and this suit was brought by the plaintiffs, as assignees of the reissue, against defendants, as infringers of the three claims. Although the complainants took testimony in support of their charge that all of the claims had been infringed, they have withdrawn from the controversy the second and third claims, and rely solely on the first, which is identical with the single claim in the original patent. *Gage* v. *Herring,* 107 U. S. 640, 2 Sup. Ct. Rep. 819.

The improvement is described thus: A represents the frame of the grain platform, through one end of which the elevator frame, B, is hinged, and connected by a rope or chain, *g,* to a post, G, rising from the rear part of the frame. The rope or chain, *g,* sustains the frame, B, at whatever angle it may be adjusted in the ordinary way. C represents an endless apron, which is applied around the rollers, *c, c,* and arranged in the rear of the cutting apparatus, so as to receive upon it the grain as it is cut. This apron is moved in the direction of the elevator, and delivers the grain between the two endless aprons, D and E, in the elevator at the lower end. The apron, E, is applied around two rollers, *e, e,* at either end of the elevator over which it revolves, and the apron, D, is also applied around two rollers, *d, e,* at either end of the elevator over which it revolves. The three rollers, *c, c', d,* nearest the joint of the frame, B, have pulleys, J L L, keyed on their shafts, around which bands are passed as shown in the drawing. The shaft, *c',* and the lower shaft, *e,* are journaled in the frame, A, and the lower roller, *a,* is journaled with the adjustable frame, B. The bands which connect the pulleys, L L', is crossed in order to give the inside surfaces of the aprons, D and E, motion in the same direction. The lower roller, *e,* is located at the joint between the frames, A and B; and the lower roller, *a,* is placed in the frame, B, and describes the arc of a circle in relation to the axis of the lower roller, *e,* when the frame, B, is adjusted, thereby always maintaining the tension of the band by which the pulleys are connected. Motion is given to the pulley, L, by means of a pulley applied to the belt on the draft-frame. Teeth may be applied on the endless aprons, C, E, and, if desired, on the apron, D. The grain is thus delivered by the apron, C, between the aprons, D, E, which elevate it to the highest point of the frame, B, and discharge it into a wagon or other suitable structure. The apron, D, not only assists the apron, E, in raising the frame, but also operates as a guard to prevent the grain from being blown off this apron while being raised.

The first claim reads thus:

"The adjustable elevator frame, B, having elevator aprons, D, E, independent of the platform apron, C, hinged to the grain platform, A, on the journals of the lower elevator roller, *e,* and the apron to operate it by means of

belts and pulleys, or their equivalents, substantially as and for the purpose described."

The patent contains two other claims, but it is not insisted that they are infringed.

It is admitted that the defendants have infringed if the specifications describe a patentable improvement which was perfected in 1863. For some time previous to that year, the patentee and his father, A. F. Randolph, used a machine with two endless aprons,—one on the platform, and one in the elevator spout; and the patentee testifies that during the harvest of that year he added to this machine a second or upper apron in the spout, and thus completed his invention just as it is described in his patent. Having done this, and demonstrated the successful operation of his machine by using it in harvesting grain on his father's farm, which they appear to have cultivated somewhat on joint account, as well as in assisting several of the neighbors in harvesting their grain, the patentee, as he says, removed the additional or upper apron from the elevator spout, and sold the machine containing two aprons. His sole reason, he testifies, for removing the apron, and laying it away, was that others might not obtain a knowledge of his invention before he could obtain the necessary means to procure a patent for it. If the header which was thus sold and continued in public use was not the same machine described in the patent, it is not unreasonable to suppose that, to one skilled in the art, the machine itself afforded evidence that an additional apron had been operated in the elevator spout, and that the necessary machinery, in the way of pulleys, rollers, and gearing, had been used in its operation, or attempted operation. At the time the patentee perfected his invention he had a family, and he and his father lived together on the latter's farm of 160 acres in McHenry county, Illinois; his father being a widower, and having no other children. Besides operating the farm together, the son and father, from 1863 to 1869, manufactured and sold yearly several machines without the third apron. The father sold the farm in 1869, and, with N. W. Lewis, commenced manufacturing and selling the same machine with two aprons at Grinnell, Iowa; and, at the same time, or about that time, the patentee quit farming and manufacturing, and commenced the study of medicine. In 1870 or 1871 he graduated from one of the medical colleges at Chicago, and at once located at Bedford, Iowa, as a physician. N. W. Lewis testifies that he was present when the additional or upper apron was attached to the machine in 1863, and operated by ropes, pulleys, and a twisted leather belt; that he understood, at the time, the improvement was not a success; that in 1872 he, and A. F. Randolph, and George Parsons, a mechanic in their employment, tried to devise a method which would make the elevator with the double aprons operate successfully; that finally he and Parsons suggested the use of a tumbling rod, which A. F. Randolph thought would not do. Parsons testifies that A. F. Randolph told him, about this time, of having tried, without success, to use an additional apron in the elevator; that he (Parsons) then made an elevator containing two aprons, and attached it to the header,—part of the

machinery used being his own, and part such as had been suggested by
A. F. Randolph; that, seeing the machine would operate successfully
with this attachment, A. F. Randolph remarked that, if he succeeded
in getting a patent, he would compensate Parsons.

Charles S. Stickel testifies that he was present in 1872 when Parsons
attached an elevator spout containing two aprons to the header, which A.
F. Randolph was operating in the field; that he made 30 machines con-
taining this improvement for Randolph and Lewis; and that neither father
nor son claimed the latter was entitled to royalty on these machines.   On
April 5, 1873, A. F. Randolph entered into a written contract with
Charles Denton, in which it was recited that he (A. F. Randolph) had
invented a machine for harvesting grain, and was about to get a pat-
ent for his invention.   By the terms of this contract, Denton agreed, at
his own expense, to make a model of the machine showing the improve-
ment, and secure a patent for the invention in the name of A. F. Ran-
dolph; in consideration of which the latter agreed that Denton should
have the exclusive right to make and sell the machines for six years,
subject, however, to the right of N. W. Lewis to make and sell them at
Grinnell, Iowa, and in the territory tributary thereto.   It was further
agreed that Denton should make and deliver to W. F. Randolph, for
$200 each, all the machines the latter might order in May and June of
each year during the continuance of the contract; which should be sold,
however, at prices to be fixed from time to time by Denton, who was not
to be liable in damages for failure from any cause to furnish machines
as ordered.   A. F. Randolph was to pay all expenses incurred in prose-
cuting and defending infringement suits, as well as all expense incurred
in procuring, or attempting to procure, a patent, and the contract could
be rescinded by Denton at pleasure.

Up to this time, and later, A. F. Randolph claimed that he was the
inventor and owner of the improvement; that he and his son had not
been able to make the machine operate successfully in Illinois in 1863;
and that, becoming discouraged, his son had sold his interests to him
for $600.   Shortly after the Denton contract was entered into, the patentee
went to Grinnell on the invitation of his father, and, after arriving there,
told Stickel that long before he had sold his interest in the machine, or
machine business, to his father, for $600, and had commenced studying
medicine.   This conversation was after Stickel had agreed to build 30
machines.   Doubtless, it was after the father realized he had made an un-
wise contract with Denton that he sent for his son to come to Grinnell;
and it is probable that, if this contract had not been entered into, the son
would never have applied for a patent.   It is certainly significant, so
far as the evidence shows, that it was not until after the son arrived
at Grinnell that he claimed to be the inventor, or to have any inter-
est in the improvement.   If he succeeded in 1863 in inventing a pat-
entable improvement on headers, the evidence shows that he aban-
doned his invention to the public.   His explanation of his delay of
10 years in making application for a patent is utterly unreasonable.
After 1863, he and his father cultivated the farm until it was sold in

1869, and each year they made and sold several machines. After the farm was sold, the patentee appears to have had sufficient means to support himself and family while obtaining a medical education. If he was able to do all this, he was certainly able to employ a patent solicitor, and pay the necessary fees at the patent-office. And, besides this, his father was able to have assisted him, and the record does not show that he was unwilling to do so.

Other questions were argued by counsel, but sufficient has been stated to show that the bill should be dismissed for want of equity.